## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
Jessica Lynn Avery,                     )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )          Civil Action No. 11-30100-DJC
                                        )
Michael J. Astrue, Commissioner,        )
Social Security Administration,         )
                                        )
        Defendant.                      )
_____)

## MEMORANDUM AND ORDER

CASPER, J.                                                    September 21, 2012

## I.      Introduction

        Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3), Plaintiff Jessica Lynn Avery ("Avery") brings this action for judicial review of the final

decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("the

Commissioner"), issued by an Administrative Law Judge ("ALJ") on November 19, 2010, denying

her claim for disability insurance benefits ("SSDI") and supplemental security income ("SSI").

Before the Court are Avery's Motion to Reverse or Remand the Decision of the ALJ and the

Commissioner's Motion to Affirm that decision. Avery claims that the ALJ erred in two ways: first,

by making an adverse credibility determination about Avery's testimony; and second, by making

a determination regarding Avery's "residual functional capacity" ("RFC") that is inconsistent with

the opinions of two of Avery's treating physicians. For the reasons stated below, the Court

GRANTS the Commissioner's motion to affirm and DENIES Avery's motion to reverse or remand.

1

## II.   Factual Background

Avery was 21 years old when she ceased working on October 1, 2007.  R. 153.  She had previously worked as an assistant manager at a doughnut shop and as a service writer at an auto-body shop.  R. 153, 49.  In her application for SSDI and SSI with the SSA, she alleged disability due to, among other things, diabetes, vomiting and depression.  R. 152, 153.

## III.   Procedural Background

Avery filed claims for SSDI and SSI with the SSA on October 22, 2008, asserting that she was unable to work as of October 1, 2007.  R. 153.  After initial review, her claims were denied on March 31, 2009.  R. 71.  Her claims were reviewed by a Federal Reviewing Official and again denied on October 21, 2009.  R. 78.  On November 17, 2009, Avery filed a timely request for a hearing before an ALJ pursuant to SSA regulations.  R. 87.  A hearing was held before an ALJ on August 12, 2010.  R. 19.  In a written decision dated November 19, 2010, the ALJ determined that Avery was not disabled within the meaning of the Social Security Act from October 1, 2007 through the date of the decision.  R. 7.

Although the ALJ notified Avery that the SSA's Decision Review Board ("the Board") selected her claim for review, R. 4, the Board did not complete its review of Avery's claim during the requisite time period.  R.1.  Accordingly, the ALJ's decision is the Commissioner's final decision.  R.1.

## IV.   Discussion

### A.   Legal Standards

#### 1.   Entitlement to Disability Benefits and Supplemental Security Income

A claimant's entitlement to SSDI and SSI turns in part on whether she has a "disability,"

defined in the Social Security context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The inability must be severe, rendering the claimant unable to do her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–.1511.

The Commissioner follows a five-step process to determine whether an individual has a disability for Social Security purposes and thus whether that individual's application for benefits will be granted. 20 C.F.R. § 416.920. The determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, if the applicant's residual functional capacity ("RFC") is such that she can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given her RFC, education, work experience, and age, is unable to do any other work, the application is granted. Id.

## 2. Standard of Review

This Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record, 42 U.S.C. § 405(g), but such review is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of

Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)).  The ALJ's findings of fact are conclusive when supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

### B. Before the ALJ

#### 1. Medical History

The ALJ had before her extensive evidence about Avery's medical history over a three-year period, including diagnoses and treatment history, particularly in regard to Avery's diabetes and vomiting.

##### a. 2007

Avery was admitted to the emergency room at Noble Hospital on January 15, 2007, R. 311, complaining of vomiting beginning a few days prior to admission and elevated blood sugar levels. R. 307.  The hospital records stated that Avery is "known to have very brittle diabetes mellitus type I and has been hospitalized on multiple occasions for DKA,[1] typically associated with [an] urinary tract infection."  R. 311.  At the hospital, she was given intravenous fluids for hydration and a continuous insulin infusion.  R. 311.  Dr. Denzil Reid noted that Avery had "not been measuring her blood sugars at home."  R. 311.  Dr. Reid had a "long discussion with [Avery] and her mother about the need for more vigilance with regard to her blood sugar control."  R. 311.  Avery was discharged

---

[1] Diabetic ketoacidosis (DKA) "is a problem that occurs in people with diabetes.  It occurs when the body cannot use sugar (glucose) as a fuel source because there is no insulin or not enough insulin.  Fat is used for fuel instead."  U.S. Nat'l Library of Medicine, Medline Plus, "Diabetic ketoacidosis," http://www.nlm.nih.gov/medlineplus/ency/article/000320.htm (last visited Sept. 22, 2012).

from the hospital on January 19, 2007 when her DKA was "resolved."  R. 312.

On February 14 through February 16, 2007, Avery was hospitalized for vomiting associated with viral gastroenteritis (stomach flu) with DKA secondary to that diagnosis.  R. 357.  Avery was hospitalized again on March 27, 2007 for complaints of vomiting due to food poisoning.  R. 389.

The records of Avery's December 11, 2007 appointment with Dr. James Cook, a cardiologist, note that Avery was pregnant and was to be evaluated for an abnormal EKG.  R. 217. Dr. Cook stated that Avery's "appetite [was] good."  R. 217.  Avery "denie[d] pain, chest pain or shortness of breath" and did not complain of any vomiting.  R. 217.  After a physical examination, Dr. Cook concluded that Avery did not require any further cardiovascular investigation or testing. R. 217.

### b.      2008

On February 12, 2008, Avery visited Dr. Cook again.  R. 216.  Dr. Cook stated that Avery had been "tolerating her pregnancy reasonably well except for some hyperemesis gravida."[2] R. 216. On March 14, 2008, Avery delivered her child by cesarean section.  R. 230.

Less than a month later, on April 10, 2008, Avery met with Dr. Phillip Hsu.  R. 218–19.  Dr. Hsu noted that Avery "has a long history of diabetes which is poorly controlled and actually has recently been discharged from the hospital for diabetic control."  R. 218.  At the visit, Avery complained of numbness in her feet, but not vomiting.  R. 218.

On April 14, 2008, Avery met with Nurse Donna M. Harmon at Baystate Medical Associates

---

[2] Hyperemesis gravida is "extreme, persistent nausea and vomiting during pregnancy that may lead to dehydration."  U.S. Nat'l Library of Medicine, Medline Plus, "Hyperemesis gravidarum," http://www.nlm.nih.gov/medlineplus/ency/article/001499.htm (last visited Sept. 22, 2012).

Endocrine & Diabetes for "consultation and management of her type 1 diabetes that she has had since she was 16 years old." R. 245–46. The records of this visit noted that Avery has "no nausea, vomiting." R. 245. Avery self-reported that "she is doing very well" and that "historically [she] had not had good blood sugar control, however, through her pregnancy, she 'stayed on top of it' and that presently her blood sugars are doing very well." R. 245. Harmon "recommended that [Avery] start checking her blood sugars a little more frequently so that she can stay on top of her blood sugars." R. 246.

On June 10, 2008, Avery visited Dr. Cook. R. 214–15. Dr. Cook reported that Avery "looks very well, has lost 32 pounds, and has been very active, caring for her daughter who underwent open-heart surgery at Children's Hospital in Boston," and that her "appetite is reasonable." R. 214. At the visit, Avery denied experiencing "chest pain, shortness of breath or palpitation." R. 214.

At a August 29, 2008 visit with Dr. Chelsea Gordner, Avery reported that she had endured three weeks of nausea and vomiting in the morning. R. 602. Dr. Gordner noted that Avery's blood sugar was likely worse now because Avery was off "short acting insulin." R. 604. Accordingly, the doctor counseled her on the "importance of using both short and long acting [insulin]." R. 604. Dr. Gordner noted that Avery "[u]sed to work as [a] secretary and [at] [D]unkin [D]onuts" and that she "plans to return to work after [the] baby grows up." R. 603. The doctor described Avery's appearance as "[w]ell [d]eveloped" and "[w]ell nourished." R. 603.

Avery was hospitalized on October 2, 2008 for vomiting; the diagnosis was gastroparesis.[3]

---

[3] "Gastroparesis, also called delayed gastric emptying, is a disorder that slows or stops the movement of food from the stomach to the small intestine." Nat'l Institute of Diabetes and Digestive and Kidney Diseases, "Gastroparesis," http://digestive.niddk.nih.gov/ddiseases/pubs/gastroparesis/(last visited Sept. 22, 2012).

R. 399, 406.  On November 5, 2008, Avery visited Nurse Denise Finn-Rizzo and complained of vomiting for three months, mostly in the morning.  R. 596.  Finn-Rizzo stated that there were several possible differing diagnoses for the vomiting and recommended followup testing.  R. 599.

On November 28, 2008, Avery visited Baystate Mason Square, a medical center, and complained of nausea and vomiting.  R. 594.  Avery also visited Baystate Mason Square on December 9, 2008 and Noble Hospital on December 29, 2008, both times complaining about vomiting.  R. 590, 411.

### c.      2009

Avery visited Dr. Cook on January 13, 2009.  R. 266–67.  Dr. Cook opined that Avery "looks well" and "is leading an acceptable quality of life."  R. 266.  At the visit, Avery denied feeling chest pain.  R. 266.  Dr. Cook noted that Avery "developed some gastroparesis from diabetes" and continues to take insulin and other medications.  R. 266.  Dr. Cook also wrote, "I will say that given her diabetes, cardiovascular condition and her overall physical status, I do not believe that she can be gainfully employed at this time."  R. 267.

Avery went to Noble Hospital on January 16, 2009 complaining of vomiting beginning the day before.  R. 423, 425.  She returned on January 18, complaining of nausea and vomiting, and was hospitalized through January 21.  R. 445.  While hospitalized, she was given intravenous fluids and medication and her nausea and vomiting gradually stopped.  R. 446.  The hospital report states that Avery has a "history of diabetes mellitus Type 1, is not compliant with her regimen, and has been admitted often for diabetes ketoacidosis."  R. 445.

During February 2009, Avery sought medical attention for nausea and vomiting on five occasions at either a hospital or medical office.  See R. 465 (February 6, 2009 at Noble Hospital);

R. 482 (February 7, 2009 at Noble Hospital); R. 588 (February 9, 2009 at Baystate Mason Square);

R. 525 (February 19, 2009 at Baystate Cardiology); R. 582 (February 23, 2009 at Baystate Mason

Square).

On March 7, 2009, Avery went to Noble Hospital reporting that she began vomiting the night

before. R. 505. The medical report from the visit noted that Avery "hasn't checked her sugars that

reliably" and has a "history in the past of some insulin noncompliance." R. 506. Avery also sought

medical treatment for nausea and vomiting three additional times in March 2009 at Noble Hospital

or a Baystate medical office. See R. 654 (March 15, 2009 at Noble Hospital); R. 660 (March 16,

2009 at Noble Hospital); R. 576 (March 20, 2009 at Baystate Mason Square). On March 24, 2009,

Avery had a follow-up appointment with Physician's Assistant Dale Pappas at Baystate Cardiology.

R. 522–23. Although Avery complained of vomiting on a "daily basis," Pappas reported "no

vomiting or nauseousness . . . at today's visit." R. 522.

In April 2009, Avery went to Noble Hospital or a Baystate medical office five times to seek

medical treatment for vomiting. See R. 676 (April 11, 2009 at Noble Hospital); R. 679 (April 12,

2009 at Noble Hospital); R. 572 (April 21, 2009 at Baystate Mason Square); R. 717 (April 21, 2009

at Noble Hospital); R. 552 (April 23, 2009 at Baystate Medical Center). The record from the April

12, 2009 hospitalization stated that the cause of her intractable nausea and vomiting is "uncertain"

and that it may be associated with "cannabinoid hyperemesis syndrome"[4] and this condition should

be evaluated further after discharge. R. 687.

---

[4] Cannabinoid hyperemesis syndrome" is a disorder characterized by recurrent nausea, vomiting and abdominal pain associated with "chronic abuse" of cannabis. Siva P Sontineni, Sanjay Chaudhary, Vijaya Sontineni, and Stephen J Lanspa, "Cannabinoid Hyperemesis Syndrome: Clinical Diagnosis of an Underrecognised Manifestation of Chronic Cannabis Abuse," http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2658859/ (last visited Sept. 21, 2012).

Avery had follow-up appointments at Baystate Mason Square on May 5, 2009 and May 19, 2009.  R. 565, 562.  On May 28, 2009, Avery was again hospitalized for vomiting.  R. 728.

Avery went to Noble Hospital on July 7, 2009 and July 26, 2009 to seek medical treatment for vomiting.  R. 743, 752.  Avery was also hospitalized for vomiting twice in August 2009.  See R. 762 (August 21, 2009 at Noble Hospital); R. 774 (August 28, 2009 at Noble Hospital).

During September 2009, Avery sought medical treatment for vomiting at Noble Hospital on three occasions.  See R. 781 (September 7, 2009); R. 794 (September 15, 2009); R. 859 (September 23, 2009).  The medical records from the September 15, 2009 stated that Avery's "blood sugars have been stable . . . in the hospital even with the nausea and vomiting."  R. 806.

Avery went to Noble Hospital on October 7, 2009 and October 21, 2009 to seek medical treatment for vomiting.  R. 873, 880.  On October 16, 2009, Dr. Caroline Cole completed a "Psychiatric Review Technique" form.  R. 634.  Dr. Cole reviewed Avery's medical records from September 1, 2008 through October 14, 2009 for an "affective disorder" and concluded that Avery's impairment was "not severe."  R. 634.

On October 30, 2009, Dr. Christina Hayfron-Benjamin, Avery's primary care physician, authored a letter opining  that Avery's cyclic vomiting, need to check her blood sugars multiple times a day, and need for strong pain medications was "very disabling" for Avery.  R. 987.

In November 2009, Avery went to Noble Hospital on November 18, 2009 and November 29, 2009 to seek medical treatment for vomiting.  R. 895, 906.

### d.     2010

On January 10, 2010, February 5, 2010 and February 21, 2010, Avery sought medical treatment for vomiting at Noble Hospital.  See R. 916, 926, 935.  On January 10, Avery was

9

medicated for nausea and stopped vomiting at the hospital.  R. 920.  She was advised to continue medications as prescribed and to drink clear liquids for 12 hours.  R. 924.  On February 5, she was given intravenous medications and was told to follow-up with her primary care physician and return to the emergency room if her condition worsened.  R. 930, 933.  On February 21, Avery was also given intravenous medications and was advised to take her medications as prescribed and to drink frequent small amounts of liquids.  R. 938, 943.

In March and April 2010, Avery went to Noble Hospital on three occasions to seek medical treatment for vomiting.  See R. 944 (March 2, 2010); R. 954 (March 20, 2010); R. 965 (March 22, 2010); R. 975 (April 11, 2010).

On July 9, 2010, Dr. Hayfron-Benjamin issued another letter opining that Avery, who was "currently under [her] medical supervision," had "type 1 Diabetes[,] is insulin dependent[,] [h]as cyclic vomiting from gastroparesis[,] chronic pain syndrome and is on significant amount [sic] of narcotics."  R. 986.  The doctor opined that Avery "is disabled and unable to engage in any type of gainful employment even of a sedentary nature."  R. 986.

Avery was hospitalized at Noble Hospital from August 2, 2010 through August 6, 2010.  R. 996.  According to the hospital records, Avery reported that she had begun vomiting 24 to 48 hours prior to admission to the hospital.  R. 996.  The records state that it was "[u]nclear if DKA led to gastroparesis and therefore vomiting or if vomiting led to DKA."  R. 997.  The records also state that Avery was discharged with instructions to keep her blood sugar levels closely regulated "as even modestly elevated blood sugars can cause gastroparesis in susceptible individuals."  R. 997–98.

### 2.   ALJ Hearing

At the August 12, 2010 administrative hearing, the ALJ heard testimony from Avery and a

vocational expert ("VE").

### a.      Avery's Testimony

Avery testified that she wakes up every morning at 4:00 a.m., vomits until "noontime-ish" and that by the time she finishes vomiting she is "dehydrated," "dry heaving" and "just so tired from all the puking." R. 25.  She testified that her doctors did not have a clear answer as to exactly what was causing her to vomit.  R. 26.  According to her, the doctors "thought . . . the vomiting was morning sickness, and so they believed it was from the pregnancy so they had me stop working." R. 27.  Avery testified that she stopped working on October 1, 2007, and clarified that Dr. Albert Hsu, her obstetrician/gynecologist ("OB/GYN"), told her to stop working.  R. 26, 27.  Avery testified that after her baby was born, the nausea and vomiting did not stop. R. 27.  The ALJ asked Avery whether her "sugars are manageable."  Avery replied affirmatively, testifying, "I just have to check them often."  R. 37.  Avery testified that she lives with her daughter and that her fiancé/boyfriend and brother occasionally stay with her, "depending on how much help [she] need[s]." R. 28–29.  She stated that her fiancé comes over in the morning to take care of the baby until she can "get up and get moving, get going," R. 34, and that her brother comes over in the afternoon to help her with the baby "almost every day."  R. 35, 36.  Avery said she "sit[s] around the house a lot" and tries to play with her daughter.  R. 35.  Avery testified that she does not get a restful night's sleep.  R. 44.

Avery testified that before she was pregnant, she worked full-time as an assistant manager at Dunkin' Donuts and as a service writer at an auto-body shop.  R. 47, 49.  She testified that she does not think she can do those jobs anymore because she does not have the energy due to "throwing up all the time."  R. 47.  She explained that she would miss work at least four times a week.  R. 47.

**b.      VE's Testimony**

The VE testified that he had an opportunity to review Avery's written vocational records prior to the hearing.  R. 48.  The ALJ asked the VE whether there are any jobs that are consistent with Avery's past work that could be performed under the following hypothetical:  "This is light exertion, sit/stand/walking six hours maximum each in a day, unlimited push/pull.  Posturals are all occasional.  Avoid concentrated exposure to cold, wetness, humidity and respiratory irritants and hazards.  No mental limitations."  R. 51.  In response, the VE testified that Avery could perform her past jobs as an assistant manager and service writer.  R. 51–54.

**3.      Findings of the ALJ**

Following the prescribed five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Avery has not engaged in substantial gainful activity since October 1, 2007, the alleged onset date.  R. 9.  Avery does not dispute the ALJ's finding at step one.

At step two, the ALJ found that Avery had the following severe impairments:  diabetes mellitus and diabetic gastroparesis.  R. 9.  The ALJ found that Avery's "medically determinable mental impairment of an affective disorder" was nonsevere because it "does not cause more than minimal limitation in [Avery's] ability to perform basic mental work activities."  R. 9.  Avery does not dispute the ALJ's findings at step two.

At step three, the ALJ found that Avery did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 10.  Avery does not dispute the ALJ's findings at step three.

Before reaching step four, the ALJ determined Avery's RFC, finding that Avery "has the [RFC] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) . . . with the

following additional limitations:  sit/stand/walk for six hours in an 8-hour workday; unlimited pushing and pulling; occasional posturals; avoid concentrated exposure to cold, wetness[,] humidity and respiratory irritants and hazards[.]  [N]o mental limitations." R. 10.  Consequently, at step four, the ALJ found that Avery is capable of performing her past relevant work as an assistant manager and service writer because this work does not require the performance of work-related activities precluded by Avery's RFC.  R. 17.  Therefore, the ALJ concluded that Avery was not disabled, from October 1, 2007 through the date of the ALJ's decision.  R. 18.  Avery disputes the ALJ's RFC assessment and his ultimate conclusion that she is not disabled.  Pl. Br. 1.

## C.  Avery's Challenges to the ALJ's Findings

Avery contends that the ALJ's RFC determination that Avery has the capacity to perform light work was not supported by substantial evidence.  Specifically, she argues that the ALJ erred first, by finding Avery not to be credible as to the frequency of her vomiting, and second, by making an RFC determination inconsistent with the opinions of two of Avery's treating physicians, Dr. Cook and Dr. Hayfron-Benjamin.  For the reasons discussed below, Avery's claims fail.

### 1.  ALJ's Adverse Credibility Determination

Avery argues that the ALJ "erred by inappropriately discrediting [her claims] based on alleged inconsistencies in her testimony and without supportive evidence on record."  Id.  "A credibility determination by the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."  Autrey v. Astrue, No. 10-30150-MAP, 2011 WL 1564442, at *4 (D. Mass. Apr. 25, 2011) (quoting Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)) (internal quotation marks omitted).  Here, the ALJ specifically found

13

Avery's testimony that she vomits every day to such a degree that it would preclude work not credible for four reasons.  First, Avery's testimony that she vomits daily from 4:00 a.m. until around 12:00 p.m. is inconsistent with the record.  R. 11.  Second, Avery's testimony that she has no trouble keeping her glucose levels stable and under control is inconsistent with the record.  R. 11.  Third, Avery's testimony that she vomits every day is inconsistent with her testimony that her glucose levels are under control.  R. 11.  Finally, Avery's testimony that she stopped working under the advice of her OB/GYN because of the severity of her "morning sickness" is inconsistent with the record.[5]  R. 12.  The Court will examine each of these reasons in turn.

a.      **ALJ's Findings that Avery's Testimony that She Vomits Daily is Inconsistent with the Record**

The ALJ found Avery's testimony that she vomits every morning to lack credibility because it was not supported by the medical record.  R. 11.  According to the ALJ, "for [Avery] to assert that she vomits daily and yet, is not hospitalized every other week despite such frequency, is not entirely credible."  R. 12.  In support of this conclusion, the ALJ relied upon an approximately four-month stretch in 2010 during which Avery only visited the emergency room once and did not otherwise see a doctor.  See R. 989, 996 (Avery hospitalized on August 2, 2010 complaining of vomiting beginning 24 to 48 hours prior to admission and stating that her most recent Emergency Room visit

_____

[5] Avery argues that the ALJ relied upon a misstatement of the facts in the record as a basis of her credibility determination.  Pl. Br. 15.  Specifically, Avery argues that the ALJ found Avery to be an untruthful witness because Avery testified that she had an ablation procedure, id., even though Avery's actual testimony was not that she had had an ablation, but rather that she was "going to eventually have an ablation."  Pl. Br. 15; R. 28.  Avery is correct that the ALJ misstated the record, compare R. 14, with R. 28, but incorrect in characterizing this misstatement as one of the ALJ's reasons for her credibility determination.  Instead, the ALJ listed the testimony about the ablation as one item in the long recitation of facts supporting her RFC determination and did not at any point state that the inconsistent testimony regarding the ablation procedure was a basis for her credibility determination.  See R. 14.

was April 11, 2010).  There were other gaps between hospitalizations that are inconsistent with Avery's testimony that she vomits every day.  For one example, on November 18, 2009, Avery visited the hospital and reported vomiting beginning two to three days prior to admission, but her most recent emergency room visit was on October 21, 2009.  R. 895–896.  Therefore, there is almost a month for which no medical records document her vomiting; see also R. 728, 743, 752, 762, 916, 926, 936.

In addition, the ALJ relied upon medical reports that describe Avery as doing well and not vomiting to support her conclusion that the record is inconsistent with Avery's testimony.  See R. 245 (medical report dated April 14, 2008 states that Avery "has no nausea [or] vomiting"); R. 214 (medical report dated June 10, 2008 does not mention any complaints of vomiting and states that Avery "looks very well . . . and has been very active caring for her daughter").  Therefore, this reason for the ALJ's credibility determination is supported by substantial evidence.

### b.    ALJ's Finding that Avery's Testimony that Her Glucose is Stable is Inconsistent with the Record

The ALJ's opinion states, "[it is significant in evaluating [Avery's] symptoms, their frequency and intensity as well as her veracity that she testified that she did not have any problems keeping her blood sugar levels under good control." R. 17.  At the hearing, Avery testified that her sugars were manageable and that she "checks] them often." R. 37.  However, the ALJ found that Avery's testimony was inconsistent with the record and pointed to medical reports showing that Avery was not keeping her blood sugar levels under good control and failed to consistently check them.  For example, Avery was hospitalized from January 15 through January 19, 2007 because she was complaining of vomiting and elevated blood sugar levels.  R. 307, 311.  The medical records from the emergency room visit stated that she had "not been measuring her blood sugars at home"

and that she had "not been very compliant" with managing her blood sugar. R. 311. The doctor also had a "long discussion with [Avery] and her mother about the need for more vigilance with regard to her blood sugar control." R. 311; see also R. 218 (an "Electromyography Report," dated April 10, 2008, states Avery "has a long history of diabetes which is poorly controlled"); R. 445 (medical records from January 18–21, 2009 hospitalization state "[Avery] has history of diabetes mellitus Type 1, is not compliant with her regimen, and has been admitted often for diabetes ketoacidosis"); R. 506 (medical records from March 7, 2009 hospitalization state "she hasn't checked her sugars that reliably"); R. 996 (medical records from August 2, 2010 hospitalization state that Avery reported that she began vomiting 24 to 48 hours prior to admission and subsequently did not take her insulin). Therefore, this reason for doubting Avery's credibility is supported by substantial evidence.

### c.    ALJ's Finding that Avery's Testimony that She Vomits Daily is Inconsistent with Her Testimony that Her Glucose is Stable

The ALJ found that Avery's statements regarding her glucose levels and frequency of vomiting were inconsistent with one another because "[i]f she has good glucose control, then she is not vomiting every day because the physicians have opined that her vomiting and gastroparesis are from a failure to adhere to proper glucose maintenance." R. 12. The ALJ relied upon the medical records from Avery's August 2, 2010 hospitalization for the proposition that "physicians have opined that her vomiting and gastroparesis are from a failure to adhere to proper glucose maintenance." R. 12. According to the ALJ, Avery's "most recent hospitalization in August 2010 was due to her not taking her insulin medication at all. The physicians documented that her lack of insulin was the direct cause of her vomiting, her glucose imbalance, her diabetic ketoacidosis and her hospitalization." R. 12. The August 2010 records indicated that it is "[u]nclear if DKA led to

16

gastroparesis and therefore vomiting or if vomiting led to DKA." R. 997. However, the reports state that Avery was "instructed to keep her blood sugars closely regulated, as even modestly elevated blood sugars can cause gastroparesis in susceptible individuals," suggesting that the doctors were, at minimum, concerned about the correlation between the two. R. 997-98.

> **d.     ALJ's Finding that Avery's Testimony that She Stopped Working on the Advice of Her OB/GYN Because of the Severity of Her Morning Sickness is Inconsistent with the Record**

The ALJ stated that "[a]nother reason that detracts from [Avery's] credibility is the fact that in her application for disability benefits, she claimed that she stopped working because she was pregnant. At the hearing, Avery testified that she was told by her OB/GYN not to work because of the severity of her 'morning sickness.'" R. 12. The ALJ found that "there is no corroboration of this in the records," and indeed there are no medical records from Avery's OB/GYN, Dr. Hsu, that support her assertion that her OB/GYN instructed her to stop working. R. 12. The ALJ pointed to a February 2008 report to support her conclusion that Avery's testimony is inconsistent with the record. R. 13. On February 12, 2008, Dr. Cook examined Avery and stated that "[s]he has been tolerating her pregnancy reasonably well except for some hyperemesis gravida." R. 216.

Given the ALJ's specific findings, each supported by the record, for her determination that Avery was not credible, this Court concludes that such conclusion was supported by substantial evidence.

> **2.     The Treating Physicians' Opinions**

Avery argues that Dr. Hayfron-Benjamin's medical opinions, dated July 9, 2010 and October 30, 2009, and Dr. Cook's medical opinion, dated January 13, 2009, should have compelled the ALJ to make a RFC determination consistent with those opinions and that the ALJ erred by reaching an alternate determination.

       **a.**       **Dr. Hayfron-Benjamin's Opinions Dated October 30, 2009 and July 9, 2010**

The ALJ noted that Dr. Hayfron-Benjamin was Avery's primary care physician. R. 17. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). When a treating physician's opinion is not given controlling weight, the ALJ must then determine the amount of weight given to the opinion based on factors that include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides evidence in support of the opinion, whether the opinion is consistent with the record as a whole, whether the physician is a specialist in the field and any other relevant factors such as the extent to which the physician is familiar with the other information in the claimant's case record. Id. § 404.1527(c). "The ALJ in [her] opinion, must give 'good reasons' for the weight [she] ultimately assigns to the treating source opinion." Gagnon v. Astrue, No. 1:11-CV-10481-PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012).

Dr. Hayfron-Benjamin's medical opinion dated July 9, 2010 (the "2010 Opinion") stated in its entirety:

> This is to certify that Jessica Avery (DOB: 4/30/1986) is currently under my medical supervision. She has type 1 Diabetes [and] is insulin dependent. [She] [h]as cyclic vomiting from gastroparesis[,] chronic pain syndrome and is on significant amount[s] of narcotics[.] As a result she is disabled and unable to engage in any type of gainful employment even of a sedentary nature.

R. 986. The ALJ stated that she gave this opinion "little weight" and listed multiple reasons for doing so, which are consistent with the factors outlined in 20 C.F.R. § 404.1527(c). R. 17.

First, the ALJ considered whether Dr. Hayfron-Benjamin offered any evidence in support of the opinion.  R. 17.  The ALJ found that Dr. Hayfron-Benjamin "did not provide any narrative explanation or detailed facts and findings upon which to predicate her conclusions" and that the opinion appeared to be based upon "the claimant's subjective allegations rather than objective findings."  R. 17.  The Court notes that Dr. Hayfron-Benjamin's opinion is not accompanied by any laboratory reports and simply lists Avery's conditions without any explanation as to how they limit her ability to work.  R. 986.

Second, the ALJ considered the extent to which Dr. Hayfron-Benjamin was familiar with the other information in Avery's case record.  R. 17.  The ALJ concluded that "there is no evidence that this physician has reviewed any of the claimant's other medical records in order to make an appropriate analysis of all of the claimant's records before rendering a conclusion."  R. 17.

Third, the ALJ considered the length of Dr. Hayfron-Benjamin's treatment relationship with Avery, the frequency with which Dr. Hayfron-Benjamin examined Avery and the nature and extent of the treatment relationship.  R. 17.  The ALJ noted that "there are no records from this physician indicating that she had ever done a thorough physical examination to evaluate, test and document the claimant's physical abilities and limitations."  R. 17.  The Court finds that despite hospital records instructing Avery to schedule follow-up appointments with Dr. Hayfron-Benjamin, see, e.g., R. 887 (October 21, 2009  record instructing Avery to call Dr. Hayfron-Benjamin to schedule an appointment to be rechecked that day); R. 902 (November 18, 2009 record instructing Avery to follow-up with her primary-care provider, Dr. Hayfron-Benjamin); R. 933 (February 5, 2010 record instructing Avery to follow-up with Dr. Hayfron-Benjamin as needed); R. 943 (February 21, 2010 record instructing Avery to follow-up with Dr. Hayfron-Benjamin to schedule an appointment to be

19

rechecked if she was not feeling better), there are no records from Dr. Hayfron-Benjamin documenting that Avery visited her for such follow-up.

Finally, the ALJ stated that the "decision of whether [Avery] is disabled is a decision reserved to the Commissioner."[6]  R. 17.  The ALJ's statement correctly reflects the law.  20 C.F.R. § 404.1527(d)(1) ( providing that "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled").

Prior to the 2010 Opinion, Dr. Hayfron-Benjamin had issued another medical opinion on October 30, 2009 (the "2009 Opinion") which states in its entirety:

> This is to certify that Jessica Avery (DOB: 4/30/1986) is currently under my medical supervision.  She has cyclic vomiting from gastroparesis diabetes and peripheral neuropathy[.]  [S]he has to check her blood sugars four times a day and is on strong medications for her pain[.]  As a result this is very disabling for patient[.]

R. 987.  Like the 2010 Opinion, the 2009 Opinion was not accompanied by any laboratory results or other supporting documentation.  The ALJ does not explicitly mention this earlier 2009 Opinion.  However, the ALJ is "not obligated to discuss every bit of evidence."  Frost v. Barnhart, 121 F. App'x 399, 400 (1st Cir. 2005); accord Miller ex rel. K.M. v. Astrue, No. 2009-12018-RBC, 2011 WL 2462473, at *11 (D. Mass. June 16, 2011).  Because the two reports are by the same physician and the content in each is substantially similar, the reasons that the ALJ gave for providing little weight to the 2010 Opinion apply equally to the 2009 Opinion.  In light of the foregoing, the ALJ

---

[6] Furthermore, the ALJ noted that Dr. Hayfron-Benjamin's opinion was less an objective discussion of Avery's medical conditions and rather was "an accommodation intended to increase the probability of disability and to aid in the granting of the application [for Social Security benefits]."  R. 17.

properly considered relevant factors in determining to give "little weight" to Dr. Hayfron-Benjamin's opinions.

### b.      Dr. Cook's Opinion Dated January 13, 2009

Dr. Cook's opinion dated January 13, 2009 states that he saw Avery in his office on January 13, 2009.  R. 266.  Dr. Cook noted that she "looks well" and "is leading an acceptable quality of life." R. 266.  This opinion is accompanied by laboratory reports, R. 268–69, and followed other reports of Avery's medical condition, also in the record.  See, e.g., R. 217 (December 11, 2007: "She denies pain, chest pain or shortness of breath"; "Her appetite is good and her exercise tolerance is normal by report"; "At this point, I do not believe Ms. Avery requires any further cardiovascular investigation"); R. 216 (February 12, 2008: "She has been tolerating her pregnancy reasonably well except for some [severe form of morning sickness]"; "She has had no significant palpitation and her diabetes mellitus appears under reasonable control."); R. 214 (June 10, 2008: "She looks very well, has lost 32 pounds, and has been very active, caring for her daughter who underwent open-heart surgery at Children's Hospital in Boston.  She has had not palpitations, shortness of breath, or chest discomfort"; "Her appetite is reasonable").

In support of her argument that the ALJ made a RFC determination inconsistent with Dr. Cook's opinion, Avery points to the last sentence of Dr. Cook's January 13, 2009 opinion, which stated that "I will say that given [Avery's] diabetes, cardiovascular condition and her overall physical status, I do not believe that she can be gainfully employed at this time."  R. 267.  Although the ALJ did not discuss Dr. Cook's January 13, 2009 opinion (and, as the Commissioner acknowledges, it would have been preferable if she had), the doctor's statement is a legal conclusion on the ultimate issue of disability and the ALJ was not required to accept it.  See 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  Accordingly, given the limits of this opinion and the fact that the ALJ's determination

was supported by substantial evidence in the record, the failure to cite and credit Dr. Cook's opinion does not warrant reversal or remand.[7]

## V.      Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Avery's motion to reverse or remand is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge

---

[7] Avery also relies upon Dr. Hayfron-Benjamin's and Dr. Cook's medical opinions to argue that Avery is entitled, at a minimum, to a closed period of benefits.  Pl. Br. 16.  However, given the ALJ's ruling that she is not disabled during the entire period under review, now affirmed by this Court, Avery is also not entitled to benefits during any closed period.